[No. 4817–1. Division One. July 18, 1977.]

THE STATE OF WASHINGTON, *Respondent,* v. TOMMIE
MODICA, *Appellant.*

468

*Edwards, Wetherall & Barbieri, Charles K. Wiggins,* and *Malcolm L. Edwards,* for appellant.

*Christopher T. Bayley, Prosecuting Attorney,* and *James R. Miller, Deputy,* for respondent.

PER CURIAM.—The defendant, Tommie Modica, was charged with the second–degree murder of Otis Davis. The jury found him guilty of murder in the second degree and returned a special verdict that he was armed with a firearm at the time of the commission of the offense. The defendant was sentenced to a term of not more than 50 years in prison. He appeals.

Otis Davis was shot and killed on February 17, 1976. He was living in an apartment building in Seattle, and the defendant lived in the same building, sharing with one Dennis Ball the apartment directly above Davis' apartment. A witness for the prosecution, the manager of the apartment building, testified that prior to the night of the shooting Davis had caused trouble around the apartment building, parking in other residents' spaces and complaining about other residents parking in his space. The apartment manager said that he had been unable to handle

Davis and had asked the owners of the building to resolve the problem of Davis' disturbing behavior.

On the night of February 17, the defendant parked in Davis' father's parking stall, because his own stall was occupied. Davis became angry when he saw the defendant's car and demanded that it be moved immediately. The defendant refused and an argument ensued. Davis threatened to have the car towed away. At this point, the defendant sought out the apartment manager to resolve the dispute, and Davis threatened the defendant as he left the building.

The defendant found the manager on the street in front of the building and asked him what was wrong with Davis. The manager said that although the defendant was "pretty hot" at this point, his demeanor was "gentlemanly" and "peaceful." The manager told the defendant about Davis' "bad attitude," that he had been unable to handle Davis, had "decided to not continue fooling with the guy," and that "there wasn't anything he could do about it." The manager agreed, however, to talk to Davis at that time.

During the trial, the testimony of the apartment manager and the defendant's testimony concerning the substance of their conversation about Davis conflicted upon one major point. The manager testified that the defendant said of Davis, "I'll blow him away," but the defendant denied ever having made such a statement. The defendant testified that the only mention of violence in his conversation with the manager was the manager's statement that recently Davis had beaten someone almost to death with a gun. The manager testified that they had discussed Davis' bad attitude, but he did not remember whether he told the defendant about the assault charge against Davis.

After his conversation with the defendant, the apartment manager went up to Davis' apartment while the defendant returned to his own apartment. The manager testified that at that time Davis was "up tight" and began complaining about the defendant. The manager said that Davis told him that he had been in a fight and was upset over problems he

was having with the police. When Davis seemed to calm down, he and the manager began drinking gin.

The testimony showed that at about the time that the manager and the victim began to drink together, the defendant was telling Dennis Ball about the parking stall dispute. Ball suggested that he and the defendant go to Davis' apartment to discuss the problem. The apartment manager was still in Davis' living room when the defendant and Ball arrived and they were admitted to the apartment by Davis. There is conflicting testimony upon whether or not defendant was armed when he arrived at Davis' apartment. The apartment manager testified that he saw a gun sticking out above the defendant's hip, but the defendant denied being armed when he went to the apartment.

A heated argument began after the defendant arrived at Davis' apartment. Both the defendant and Dennis Ball testified that Davis stated that he was going to get his "piece," and started down the hallway toward the bedroom followed by the defendant and Ball. The manager stated that he thought Davis said, as he was walking down the hallway, that he did not have a gun.

During the argument in the living room, Kathy Smith was sitting in the bedroom of Davis' apartment. She had known Davis for almost 2 years, and had lived with him for about a year and a half. She testified that she was sitting on the bed when Davis, the defendant and Dennis Ball entered the bedroom. She said she knew Davis had had at least two guns, although she had not seen either one for some time, and she testified she thought that Davis might have been looking for one of the guns, but she was uncertain. Ms. Smith further testified that after a scuffle in the bedroom Davis told the defendant and Dennis Ball that they were being disrespectful to him in his home, and told them to leave. As the three men emerged from the bedroom into the hallway, Davis ordered the defendant and Ball out of the apartment. A scuffle ensued in the hallway, and a shot was fired.

The manager was unable to see who was holding the gun, but saw Davis sink to the floor. Later that night, Dennis Ball described the struggle in the hallway to a police officer. At that time he told the officer that during the argument Davis kicked him in the groin and he fell to the floor. He said that the defendant was trying to get out of the apartment when he saw Davis knock Ball to the floor and kick him, and that Davis then turned and went for the defendant. Ball then said that in the scuffle the defendant grabbed the gun from his belt and Davis was shot.

Ms. Smith denied that there was a scuffle or that blows were exchanged. She testified that the defendant pulled out a gun and shot Davis and that all she saw of the gun was "the barrel out of the side of his jacket."

A security officer with the Department of Social and Health Services testified that he lived directly across the hallway from Davis' apartment, and that he heard a loud argument occurring in Davis' apartment. This witness said he heard Davis say, "I don't want to box," about 1 minute prior to the shooting, and then heard a scuffle and a shot almost simultaneously.

The next day, upon learning that Davis had died, the defendant turned himself in to the police. The defendant was advised of his constitutional rights and waived those rights in the presence of his attorney. A written statement was taken at that time which was admitted into evidence at the time of trial. The interrogating detective testified as follows:

Q [By prosecutor] Now during the time that you took that statement, did you ask Mr. Modica if he had a gun when he went to Apartment No. 9, Otis Davis's apartment?

A Yes, I did.

Q What was his response?

A They would not answer that question.

There was no objection to the questions upon direct examination and the matter was not pursued upon cross–examination.

472

When the defendant testified at the trial, the prosecutor cross–examined him about his interrogation by the detective as follows:

Q And your testimony is that you did not have a gun in your possession when you went down there?
A No.
Q Do you recall Detective Moran testifying Friday that he wanted to ask you that question and he took a statement from you?
A Yes.
Q Your attorney said you didn't want to talk about that—
. . .
A No. It wasn't worded like that.
Q Well, how was it worded?
A I mean, it was worded like it was—I wasn't going to tell him everything.

On redirect examination, the defendant was asked by his attorney what the attorney had told the detective when the defendant surrendered himself:

A You said be the whole truth, that would be—that I'm going to say everything.
Q And did you tell Detective Moran the whole truth?
A Yes, I did.

On recross–examination, the prosecutor asked:

Q . . . What was meant by you when you said that you weren't going to say everything?
A Well, just talking about the little details, is all.
Q Well, little details like what? You carrying a gun into the apartment?
A No.

At no time did defense counsel object to the cross–examination concerning the defendant's refusal to tell the detective about the gun.

The prosecutor called to the jury's attention defendant's refusal to answer the detective's question during his closing argument. He argued that in evaluating the defendant's credibility the jury should consider the testimony that the defendant stated that he would not tell "the whole truth."

He argued further that the defendant's statement consti-
tuted evidence that the defendant had been armed:

> That's part of the truth they didn't want to tell, that he
> did have a gun when he walked into that apartment. And
> that's why he didn't want to answer that question.

The information filed against the defendant set forth two
counts. The first count charged him with the crime of sec-
ond–degree murder, committed either of two ways: By
shooting Otis Davis with the design to effect his death; or
by mortally wounding Otis Davis "while engaged in the
commission of a felony, to wit: assault in the second
degree." The second count charged the defendant with vio-
lation of the Uniform Firearms Act, RCW 9.41.040. At the
outset of the trial, the court granted the prosecution's
motion to sever the violation of the Uniform Firearms Act
from count 1, the murder charge. At the conclusion of the
prosecution's case, the defendant moved for dismissal of
the murder charge on the ground that no independent fel-
ony had been proven. It was argued that the only possible
felony charge was the alleged assault when the defendant
fired the gun. The court denied the motion, stating that the
State had charged both felony murder and a design to
effect the death of Otis Davis and that objections to the
felony murder charge should be raised with respect to the
proposed jury instructions.

The defendant excepted to the giving of the court's
instructions Nos. 5 and 6 on the ground that the doctrine of
merger should be applied and the act or the assault on
which the State predicated its theory of the charge presup-
posed an included offense within the charge of murder in
the second degree or manslaughter. It was the defendant's
position that, by permitting the State to allege the felony
manslaughter and murder doctrine, a situation arose where
the intent of the defendant became immaterial.

The trial court refused to give the defendant's requested
instruction which read:

> If you find beyond a reasonable doubt that an offense has been proved against the defendant, but have a reasonable doubt as to which of two or more offenses he is guilty, he shall be convicted only of the lesser.

And the trial court refused to give the proposed instruction which read:

> The defendant had a right, at the time of firing the fatal shots, to consider fully all the threats he had heard the deceased make, and acts of violence he had reason to believe the deceased had committed, in order that the defendant might know or believe the intentions of the deceased at the time the fatal shots were fired.

The issues raised on appeal are as follows:

1. Was the defendant's right to due process and his right not to incriminate himself violated by admission of the testimony that when he surrendered himself to the police he refused to answer questions concerning a gun and a reference to this refusal in closing argument?

2. Was it error to charge the defendant with felony murder where the felony charge was the second–degree assault which caused the death of the victim?

3. Was it error to fail to instruct the jury that if there existed a reasonable doubt as to which of two or more offenses the defendant might have committed that he should be convicted only of the lesser?

4. Was it wrong not to instruct the jury that the defendant had a right to consider acts of violence he had reason to believe the deceased had committed?

> *Was the defendant's right to due process and his right not to incriminate himself violated by admission of the testimony that when he surrendered himself to the police he refused to answer questions concerning a gun and a reference to this refusal in closing argument?*

The defendant asserts that his right to due process and his right not to incriminate himself were violated when the prosecutor (1) brought out in its direct examination of a police detective the fact that the defendant had declined to

answer the question as to whether he had a gun when he entered Davis' apartment, (2) questioned the defendant on why he had not answered this question on cross–examination, and (3) emphasized in final argument to the jury that an inference arose that defendant had a gun when he entered Davis' apartment when he refused to answer the question. We agree.

█ It was recently stated in *Doyle v. Ohio,* 426 U.S. 610, 617–19, 49 L. Ed. 2d 91, 97–98, 96 S. Ct. 2240, 2244–45 (1976):

The warnings mandated by [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, see *Michigan* v. *Tucker,* 417 U. S. 433, 443–444 (1974), require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post–arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested. See *United States* v. *Hale,* 422 U. S., at 177. Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. MR. JUSTICE WHITE, concurring in the judgment in *United States* v. *Hale, supra,* at 182–183, put it very well:
"[W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him, and that he may have an attorney if he wishes, it seems to me that it does not comport with due process to permit the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial

testimony. . . . Surely Hale was not informed here that his silence, as well as his words, could be used against him at trial. Indeed, anyone would reasonably conclude from *Miranda* warnings that this would not be the case."
We hold that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving *Miranda* warnings, violated the Due Process Clause of the Fourteenth Amendment.

(Footnotes omitted.) *Accord, State v. Upton,* 16 Wn. App. 195, 198–99, 556 P.2d 239 (1976).

█ In attempting to lessen the effect of *Doyle,* the State argues that *Doyle* and *Hale* are distinguishable in that here, (1) the first mention of the defendant's refusal to answer occurred during the State's direct examination of a police detective and no objection was made, and (2) the admission of this officer's testimony was harmless error as the jury would probably have rendered the same verdict had the testimony been excluded. We do not agree with these assertions. The fact that this testimony was admitted at trial without objection is not dispositive; an error may be considered even if raised for the first time on appeal if it concerns a deprivation of constitutional rights. *See State v. McHenry,* 88 Wn.2d 211, 213, 558 P.2d 188 (1977); *State v. Kroll,* 87 Wn.2d 829, 839, 558 P.2d 173 (1976); *State v. Peterson,* 73 Wn.2d 303, 306, 438 P.2d 183 (1968).

The defendant claimed self–defense, his main assertion being that he had not gone to Davis' apartment with a gun with the intent to injure the decedent. The repeated use by the prosecution, however, of the defendant's refusal to answer questions about the gun unconstitutionally eroded this defense. Without proof of a knowing and intelligent waiver of his right to remain silent and not to incriminate himself, the fact that the first mention of the defendant's refusal to answer questions about the gun was made without objection and that the defendant's counsel also commented on it in final argument, does not waive the constitutional protection. The defendant's silence was "insolubly ambiguous". The reasoning in *Doyle v. Ohio,*

*supra,* is especially applicable, for in addition to the inference that the defendant was exercising his rights under the Fifth Amendment in refusing to answer the policeman's question, there is evidence from which inferences could be drawn that the defendant never refused to answer any question of the detective, and at trial may have been answering a different question than that asked by the prosecutor. We hold that the State's use of this "silence" to impeach the defendant's "credibility" was prejudicial error requiring a new trial.

> *Was it error to charge the defendant with felony murder where the felony charge was the second--degree assault which caused the death of the victim?*

The defendant disagrees with the reasoning and the result in *State v. Thompson,* 88 Wn.2d 13, 558 P.2d 202 (1977), but concedes that it is controlling. We agree that the defendant was properly charged with a felony--murder based upon the death caused while in the commission of an assault in the second degree.

> *Was it error to fail to instruct the jury that if there existed a reasonable doubt as to which of two or more offenses the defendant might have committed that he should be convicted only of the lesser?*

The defendant requested that the jury be instructed as follows:

> If you find beyond a reasonable doubt that an offense has been proved against the defendant, but have a reasonable doubt as to which of two or more offenses he is guilty, he shall be convicted only of the lesser.

The defendant asserts that (1) the trial court erred when it refused to give the defendant's proposed instruction, (2) that he was not obligated to offer a timely objection to the trial court's refusal to give the proposed instruction, and (3) the giving of the instruction which read:

> In the event, and only in the event, you find the defendant not guilty of the offense of murder in the second degree, it will then be your duty to determine whether the defendant is guilty of the lesser included offense of manslaughter.

combined with the failure to give the defendant's proposed instruction was prejudicial error. We disagree.

■ An alleged error in an instruction raised for the first time on appeal must involve the violation of a specific constitutional right or it will not be considered. *State v. Arndt*, 87 Wn.2d 374, 385–86, 553 P.2d 1328 (1976). Here, the defendant raised timely objections to the trial court's refusal to give a number of his proposed instructions and to the trial court's own instructions, but no objection was raised to the refusal to give the proposed instruction set forth or to the trial court's instruction. In the absence of any claim involving the violation of a specific constitutional right, we will not consider this error raised for the first time on appeal. CrR 6.15.

> *Was it wrong not to instruct the jury that the defendant had a right to consider acts of violence he had reason to believe the deceased had committed?*

The defendant asserts that the trial court erred when it refused to give his proposed instruction which read:

> The defendant had a right, at the time of firing the fatal shots, to consider fully all the threats he had heard the deceased make, and acts of violence he had reason to believe the deceased had committed, in order that the defendant might know or believe the intentions of the deceased at the time the fatal shots were fired.

This assertion is based on the proposition that none of the trial court's general self–defense instructions specifically instructed the jury that the defendant had a right to consider prior acts of violence that Davis had committed for purposes of evaluating Davis' intentions in the apartment the night of the incident.

Instructions to the jury must be read as a whole. *State v. Kroll, supra* at 843. Instructions must accurately state the

law. *State v. Mriglot,* 15 Wn. App. 446, 550 P.2d 17 (1976). Instructions must not be misleading. *State v. Upton, supra* at 204. They must not be argumentative. *State v. Lane,* 4 Wn. App. 745, 748, 484 P.2d 432 (1971). They must allow counsel to argue his theory of the case to the jury. *State v. Kindred,* 16 Wn. App. 138, 141, 553 P.2d 121 (1976).

 The giving of this instruction would have allowed reasonable inferences to be drawn that the trial court believed that the defendant did have reason to believe (1) Davis had committed prior acts of violence, and (2) that the defendant had been informed of these alleged acts. To what extent and under what circumstances Davis was involved in prior violent acts, and whether or not defendant had been told about them prior to his going into Davis' apartment the night of the incident, were questions for the trier of fact. Contradictory evidence was presented on these questions, and had the trial court given the defendant's proposed instructions it would have amounted to a comment on the evidence. This is forbidden to the trial court. *State v. Carothers,* 84 Wn.2d 256, 267, 525 P.2d 731 (1974); Const. art. 4, § 16. The proposed instruction was properly refused.

> *Was it reversible error to instruct the jury that the burden was upon the defendant to prove that the homicide was done in self-defense?*

 The defendant asserts that the instruction given on self-defense violated his right to due process of law. The instruction read:

> When a defendant claims that he killed another in the defense of his own person, the burden is upon the defendant to prove that the homicide was done in self-defense. It is not necessary for the defendant to prove this to you beyond a reasonable doubt, nor even by a preponderance of the evidence. The defense of justifiable homicide in self-defense is sufficiently established if from a consideration of all the evidence in the case you have a reasonable doubt as to whether the killing was done in self-defense.

This assertion is based on the proposition that the self–defense instruction found to be constitutionally impermissible in *State v. Roberts*, 88 Wn.2d 337, 345, 562 P.2d 1259 (1977), is virtually identical to the self–defense instruction here. We agree. After setting out the challenged self–defense instruction, the *Roberts* court stated:

Lack of justification is an element of the crime of second–degree murder. The challenged instruction places the ultimate burden of persuasion as to that element upon the defendant. He has the burden of creating a reasonable doubt in the mind of the jurors as to the issue if he wishes to avail himself of this defense. The continued use of this instruction is directly in conflict with *State v. Kroll* [87 Wn.2d 829, 558 P.2d 173 (1976)]. There we held an instruction requiring the defendant to create reasonable doubt as to the existence of the elements of second–degree murder in order to reduce the crime to manslaughter, resulted in a shift of the burden of proof which violated the concept of due process enunciated by the Supreme Court in *Mullaney v. Wilbur* [421 U.S. 684, 44 L. Ed. 2d 508, 95 S. Ct. 1881 (1975)]. The self–defense instruction presently before us places precisely the same burden upon the defendant as to the element of absence of justification. In view of the decisions in *Mullaney* and *Kroll*, it is now only permissible to place upon the defendant the obligation to produce evidence, from whatever source, tending to establish self–defense. The obligation to prove the absence of self–defense must remain at all times with the prosecution.

Here, conflicting evidence was offered as to whether the defendant came to Davis' apartment armed or whether he found the gun there and took it to prevent Davis from using it. Contradictory testimony was also taken with regard to the actual details of the scuffle and ultimate shooting. Placing the burden on the defendant "to prove that the homicide was done in self defense" fails to pass constitutional muster. As the *Roberts* court stated:

The jury should be instructed as to the pertinent aspects of the law of justification in homicide cases and then simply informed that the State has the burden to prove absence of self–defense beyond a reasonable doubt.

*State v. Roberts, supra* at 346. The defendant is entitled, upon remand of this cause for retrial, to an instruction on self-defense in accord with this opinion and the decision in *Roberts*.[1] The fact that (1) the defendant did not object to the giving of the instruction on self-defense, (2) that the defendant's own proposed instruction included similar language, or (3) that *Roberts* was decided subsequent to the trial in this matter, is not dispositive. These instructions were based upon an interpretation of the law that shifted the burden of proof to the defendant. We will consider errors raised for the first time on appeal if constitutional issues are involved. A conviction obtained under an instruction later deemed to be unconstitutional is invalid. *Leary v. United States,* 395 U.S. 6, 31, 23 L. Ed. 2d 57, 89 S. Ct. 1532 (1969); *State v. Miles,* 12 Wn. App. 694, 697, 531 P.2d 834 (1975).

The judgment of the trial court is reversed and the cause is remanded for a new trial consistent with the foregoing opinion.

---

[1]The defendant was tried under RCW 9.48.040, repealed effective July 1, 1976. *See* RCW 9A.32.050(1); *Patterson v. New York,* 432 U.S. 197, 53 L. Ed. 2d 281, 97 S. Ct. 2319 (1977); *Hankerson v. North Carolina,* 432 U.S. 233, 53 L. Ed. 2d 306, 97 S. Ct. 2339 (1977); *State v. Stepp,* 18 Wn. App. 304, 569 P.2d 1169 (1977), for further discussion of the burden of proof when self-defense is an affirmative defense.