[No. 48192–0.   En Banc.   December 29, 1983.]

*In the Matter of the Personal Restraint of*
GARY G. RICHARDSON, *Petitioner.*

*Gary G. Richardson,* pro se.

*C. Danny Clem, Prosecuting Attorney,* and *Gregg Eric Johnsen, Deputy,* for respondent.

UTTER, J.—In this personal restraint petition, petitioner Gary Richardson raises several claims. While we conclude that most of them lack merit, his claim of ineffective assistance of counsel is meritorious. The record establishes that trial counsel previously represented an important witness in the case. This establishes a prima facie case of ineffective assistance of counsel, for the trial court should have been aware of and inquired into this potential conflict of interest. If a potential conflict of interest existed, the trial court's failure to inquire automatically requires reversal even without a showing of prejudice. Remand to the Superior Court is necessary, however, to ascertain the precise nature of trial counsel's representation of the witness and whether a conflict of interest actually existed.

This case is unusual in that Mr. Richardson has completely served his prison sentence. He nonetheless seeks to remove a serious blot from his record and we should reward this quest if his rights have been violated.

Mr. Richardson was convicted of second degree assault on February 21, 1978. The charge arose out of an incident at the Interlude Tavern in Bremerton on October 15, 1977.

After leaving a card game in the back room of the tavern, Mr. Richardson walked into the main room of the tavern for a drink. From this point, the testimony of the various witnesses differs to some extent. It appears, however, that Mr. Richardson became involved in an argument with others in the tavern. The manager, Ray Blackwood, accused Mr. Richardson of sneaking beer into the cardroom and selling it to the other customers, thus depriving the tavern of sales. One of the customers, Bob Wheeler, accused Mr.

Richardson of romancing Mr. Wheeler's girl friend. The eventual victim, Farrington Kaluna, supported Mr. Wheeler and/or Mr. Blackwood and other customers indicated similar hostility. Mr. Richardson then chose to leave.

Mr. Wheeler, however, pursued his complaints out into the parking lot and a crowd gathered. Mr. Blackwood also came out of the tavern and tossed Mr. Richardson his jacket, which he had left behind. As Mr. Richardson caught the jacket a handgun in the pocket began to slip out and he caught it. The gun was apparently not seen by the surrounding crowd. As the atmosphere grew more heated, Mr. Kaluna, who was unarmed, stepped in and pushed or hit Mr. Richardson. The gun discharged and severely injured Mr. Kaluna.

Mr. Kaluna testified that he pushed Mr. Richardson because he saw Mr. Richardson raise his arm as if to strike Mr. Blackwood. Mr. Richardson denied that he made any move toward Mr. Blackwood. He testified that all he remembered was being hit from the side and feeling a jolt in his hand as the gun went off. He testified that he did not remember cocking the gun or pulling the trigger.[1] This testimony left open both the possibility of self–defense and the possibility of accident and counsel argued both theories to the jury.

As partial support for his self–defense argument, Mr. Richardson claimed that he had previously been threatened by Mr. Blackwood. Mr. Richardson had previously worked

---

[1]Mr. Richardson testified:
 Somebody, which I do not know who was on me, grabbed me, hit me, and when they grabbed me I grabbed for the gun, and then I was hit, and I went down.
 When I was hit, and I went down then falling, and it just a fine line there that when I was going down only thing I felt was a jolt in my hand and honest—honest, I don't remember cocking the gun or pulling the trigger, but when I went down I felt a jolt in my hand.
Report of Proceedings, at 658. A police officer gave hearsay testimony that Mr. Richardson's attorney told him that Mr. Richardson had said the shooting was an accident; however, Mr. Richardson never stated this directly and the attorney, of course, never took the stand to explain this hearsay.

in the cardroom for Mr. Blackwood and when he was discharged had threatened to tell the police of Mr. Blackwood's "skimming activity", a practice of not fully reporting income from the cardroom on the books. Mr. Blackwood denied any such activity.

To support Mr. Richardson's claim, defense counsel called William Clemmer, a friend of Mr. Richardson who had also worked in the cardroom for Mr. Blackwood. Counsel sought to elicit testimony from Mr. Clemmer about the skimming activity and the resultant conflict between Mr. Blackwood and Mr. Richardson. At this point, the prosecutor suggested that the court should inform Mr. Clemmer of his privilege against self–incrimination and give him an opportunity to consult with an attorney. When the court did this, it became apparent that Mr. Richardson's attorney had previously represented, or was presently representing, Mr. Clemmer as well.

> MR. SHARPE: Did the Court indicate to [Mr. Clemmer] if he wants to consult an attorney, it would give him an opportunity to do that?
> THE WITNESS: He is my—
> MR. DENEND: I'm not in a position I could advise you in both regards.
> THE COURT: There's a conflict between what he would like, I'm sure for Mr. Richardson and what he would like for you.
> MR. RICHARDSON: I can—I dropped the subpoena on him.
> THE COURT: And what he would like for you, and so you can't talk to Mr. Denend.
> THE WITNESS: Well, Mr. Denend is my attorney on—
> THE COURT: I know, Mr. Clemmer, if you'd listen. We have a problem here.

Report of Proceedings, at 483–84. Defense counsel then suggested that Mr. Clemmer simply testify generally about the bad feelings between Mr. Blackwood and Mr. Richardson. The trial court approved this suggestion and made no further inquiry.

The trial continued and the jury returned a verdict of guilty. On appeal, Mr. Richardson's new attorney raised

only one issue—whether an instruction which set forth more than one alternative method of committing second degree assault denied Mr. Richardson a unanimous jury verdict. The Court of Appeals held that it did not and affirmed Mr. Richardson's conviction. *See State v. Richardson*, 24 Wn. App. 302, 600 P.2d 696 (1979). Mr. Richardson now seeks to vacate his conviction by way of this personal restraint petition.

## I

Initially, Mr. Richardson raises several ancillary claims which are relatively easily disposed of. The first of these is simply a renewal of the claim of instructional error which he raised on direct appeal. Finding no error in the original opinion of the Court of Appeals, and there having been no significant change in the law, we forgo any further analysis and reject this claim of error. We give Mr. Richardson's additional contentions somewhat more consideration, however.

## A

Mr. Richardson also argues that his privilege against self–incrimination was violated when a police officer testified that he exercised his right to remain silent. Officer Floyd Bland did testify that Mr. Richardson "said he would not answer" in response to a question about the location of his gun. Report of Proceedings, at 305. Officer Bland also testified later that "I was advised [by Mr. Richardson's attorney] that there was no statement that would be forthcoming from the defendant". Report of Proceedings, at 426. It should be noted, however, that Mr. Richardson failed to make any objections to this testimony.

Assuming arguendo that Mr. Richardson's failure to object does not bar him from raising the issue here (*see State v. Modica*, 18 Wn. App. 467, 476, 569 P.2d 1161 (1977) (per curiam)), we must concede that this testimony did violate his privilege against self–incrimination. In *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), the Supreme Court ruled that a defendant's post–arrest

silence could not be used even for impeachment purposes. *Doyle,* at 617–18. We have held the reasoning behind *Doyle* also bars the use of post–arrest silence in the State's case in chief. *See State v. Fricks,* 91 Wn.2d 391, 396, 588 P.2d 1328 (1979). Thus, Mr. Richardson is technically correct that admission of the above testimony was error.

■ Mr. Richardson has not carried his burden of showing prejudice. When constitutional error is raised for the first time in a personal restraint petition, the petitioner must show prejudice by a preponderance of the evidence. *In re Hagler,* 97 Wn.2d 818, 826, 650 P.2d 1103 (1982). Here, the location of the gun was of little relevance to Mr. Richardson's defenses and his *attorney's* statement that he did not wish to make a statement "at this time" does not seem especially damaging either. Indeed, the State made absolutely no mention of Mr. Richardson's silence in closing argument. Under these circumstances, we believe the technical error pointed out by Mr. Richardson did no significant harm.

### B

Mr. Richardson also argues that the trial court denied him his constitutional right to represent himself. At several points during the trial Mr. Richardson sought to involve himself in argument or in questioning but was told by the trial court to restrain himself. In the last of these instances, the trial court compromised by instructing defense counsel to ask whatever questions Mr. Richardson told him to ask.

■ While the right of a criminal defendant to represent himself in court is constitutionally protected (*Faretta v. California,* 422 U.S. 806, 834, 45 L. Ed. 2d 562, 95 S. Ct. 2525 (1975)), it is not absolute. *State v. Fritz,* 21 Wn. App. 354, 365, 585 P.2d 173, 98 A.L.R.3d 1 (1978). In particular, any assertion of the right must be unequivocal and timely. *Fritz,* at 360–61. The granting of even an unequivocal demand made during trial rests largely within the informed discretion of the trial court. *Fritz,* at 361.

In the present case, Mr. Richardson's right of self–rep-

resentation was not violated. In the first place, his demand was not entirely unequivocal. Moreover, it was not made until trial had already begun. Under these circumstances, we believe the solution chosen by the trial court was within its discretion.

## II

Mr. Richardson's central claim is that he was denied effective assistance of counsel. He notes several instances of alleged incompetence; however, trial counsel's failure to fully explore Mr. Clemmer's knowledge of Mr. Blackwood's skimming activity and the resultant conflict between Mr. Blackwood and Mr. Richardson is by far the most significant.

## A

Such questioning would have strengthened Mr. Richardson's case in two ways. First, it would have given fuller support and significance to Mr. Richardson's fear of Mr. Blackwood. Second, it would have directly impeached Mr. Blackwood, who expressly denied any skimming activity. Mr. Blackwood was a key witness against Mr. Richardson, for he was the only prosecution witness who was not at least somewhat intoxicated.

Despite these considerations, we cannot say that this omission sinks to the level of ineffective assistance of counsel. This court, as well as others, has been rightly hesitant to find assistance of counsel ineffective based solely on questionable trial tactics. "While it is easy in retrospect to find fault with tactics and strategies that failed to gain an acquittal, the failure of what initially appeared to be a valid approach does not render the action of trial counsel reversible error." *State v. Renfro,* 96 Wn.2d 902, 909, 639 P.2d 737, *cert. denied,* 103 S. Ct. 94 (1982). *See also* Annot., *Modern Status of Rules and Standards in State Courts as to Adequacy of Defense Counsel's Representation of Criminal Client,* 2 A.L.R.4th 27, § 12 (1980) and cases cited therein. Even under more liberal ineffective standards which we have recently considered and left open (*see State*

*v. Adams,* 91 Wn.2d 86, 90–91, 586 P.2d 1168 (1978)), we cannot say, absent more, that trial counsel's performance was so inadequate as to constitute ineffective assistance.

## B

There is more in the present case, however. The record demonstrates on its face a potential conflict into which the trial court made absolutely no inquiry.

A special rule applies in such cases. In *Holloway v. Arkansas,* 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978), the Supreme Court held that a trial court's failure, in the face of defense counsel's warning that he had a possible conflict of interest, to either ascertain that the risk of conflict was remote or appoint different counsel per se deprived the defendant of effective assistance of counsel. *Holloway,* at 484. Moreover, the Court held, error of this nature can *never* be harmless—prejudice is to be presumed.

> In the normal case where a harmless–error rule is applied, the error occurs at trial and its scope is readily identifiable. . . . But in a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics, and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

*Holloway,* at 490–91. *See also Sixth Amendment—Conflicts of Interest in Multiple Representation of Codefendants,* 71 J. Crim. L. & Criminology 529, 537 (1980).

While *Holloway* involved a situation in which defense counsel had expressly informed the court of the possibility

of a conflict, its reasoning was extended in *Cuyler v. Sullivan,* 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980) and *Wood v. Georgia,* 450 U.S. 261, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981). In *Sullivan,* the Court noted that *Holloway* imposed no general duty to inquire about the possibility of conflict but held nevertheless that a defendant who shows that "an actual conflict of interest adversely affected his lawyer's performance" was entitled to relief even absent a showing of prejudice. *Sullivan,* at 348, 349–50. In *Wood,* the Court further clarified the duty to inquire by noting that "*Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it 'knows or reasonably should know that a particular conflict exists.'" *Wood,* at 272 n.18 (quoting *Sullivan,* at 347).

▮ Taken together, *Holloway, Sullivan,* and *Wood* create two rules. First, a trial court commits reversible error if it knows or reasonably should know of a particular conflict into which it fails to inquire. Second, reversal is always necessary where a defendant shows an actual conflict of interest adversely affecting his lawyer's performance. In neither situation need prejudice be shown.

The application of these rules is not limited to joint representation of codefendants. While most of the cases have involved that fact situation, the rules apply to any situation where defense counsel represents conflicting interests. *See, e.g., Wood,* at 266 (defense counsel paid by defendant's employer); *Sullivan,* at 337–38 (representation of codefendants in separate trials); *Alexander v. Housewright,* 667 F.2d 556, 558 (8th Cir. 1981) (previous representation of prosecution witness in action against defendant); *Stephens v. United States,* 595 F.2d 1066, 1070 (5th Cir. 1979) (simultaneous representation of prosecution witness and defendant); *Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir. 1974) (simultaneous representation of defendant in criminal trial and prosecution witness in unrelated civil litigation). That simultaneous representation of a defendant and a witness with opposing interests is such a situation is self–evident— indeed, we only recently suspended an attorney from the

practice of law for placing himself in a virtually identical situation. *See In re McMurray,* 99 Wn.2d 920, 665 P.2d 1352 (1983) (violation of CPR DR 5-105 to represent defendant after prior representation of prosecution witness in unrelated civil proceeding).

## C

In the present case, the trial court had a duty to inquire into the possibility of conflict. Mr. Clemmer stated in open court that Mr. Richardson's attorney was also his. The court itself recognized the danger of conflict arising from this joint representation, as is demonstrated by its proper refusal to allow Mr. Richardson's attorney to advise Mr. Clemmer about his testimony.

Yet the court made no further inquiry into this apparent conflict despite the fact that Mr. Richardson's attorney completely dropped his line of questioning about the alleged skimming by Mr. Blackwood. Indeed, the court affirmatively cut off Mr. Clemmer's explanation of his relationship with defense counsel. To paraphrase the Supreme Court: "The possibility of the [conflict of interest] was brought home to the court, but instead of jealously guarding [Mr. Richardson's] rights, the court may fairly be said to be responsible for creating a situation which resulted in the impairment of those rights." *Glasser v. United States,* 315 U.S. 60, 71, 86 L. Ed. 680, 62 S. Ct. 457 (1942). While the court's action in the present case may be more accurately characterized as benign neglect, it still falls far short of the active protection required by *Holloway, Sullivan,* and *Wood.*

Unfortunately, because Mr. Clemmer was cut off by both defense counsel and the trial court, the record does not reveal the precise nature of Mr. Clemmer's relationship with defense counsel. This information is necessary to resolve the present case, for the conflict of which the trial court reasonably should have known must also actually exist. *See Wood,* at 273 (remanding for hearing "to determine whether the conflict of interest that this record

strongly suggests actually existed"). Mr. Richardson has, however, established a prima facie case of error based on the record before us.

██ Ordinarily, as noted above, one raising error in a personal restraint petition must also prove by a preponderance of the evidence that the error was not harmless, *i.e.*, that it was prejudicial. *In re Hagler*, 97 Wn.2d 818, 826, 650 P.2d 1103 (1982). Where, as in the present case, however, the error which is alleged gives rise to a conclusive presumption of prejudice, proof of the error automatically provides proof of the prejudice. *Cf. In re Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983) (proof of constitutional invalidity of guilty plea constitutes proof of actual prejudice). *See also United States v. Frady*, 456 U.S. 152, 170, 71 L. Ed. 2d 816, 102 S. Ct. 1584 (1982) (indicating that prejudice requirement for federal habeas corpus relief would always be satisfied if error was one which was per se prejudicial). Thus, no independent showing of prejudice is necessary here.

Since Mr. Richardson has established a prima facie case of prejudicial error, but one which is not dispositive, we must remand to the Superior Court for further factfinding. *See In re Hews, supra* at 88–89. At the hearing, the Superior Court should determine the nature of Mr. Clemmer's relationship with defense counsel and whether or not it posed an actual conflict of interest. If it did, Mr. Richardson's petition should be granted. If there was no actual conflict, the petition should be denied.

WILLIAMS, C.J., STAFFORD, BRACHTENBACH, and DOLLIVER, JJ., and CUNNINGHAM and HENRY, JJ. Pro Tem., concur.

DORE, J. (dissenting)—The majority holds that defense counsel's previous representation of a defense witness in an unrelated proceeding establishes a prima facie case of ineffective assistance of counsel requiring reversal where the trial court failed to inquire into this potential conflict of interest. I disagree.

In addition to the exchange between the court and counsel reported by the majority opinion, the record continues:

THE COURT: Mr. Denend can't act as your attorney in this matter. It would be—it would be ethically impossible for him to do that.

THE WITNESS: Okay, I understand that.

THE COURT: If you want to talk to a lawyer you can, not him, but some other lawyer, and if you'd like to do that all you have to do is say you want to talk to a lawyer. We'll excuse you now. You can go talk to a lawyer and then come back tomorrow with your lawyer here if you want.

MR. DENEND: Maybe it would be better, Your Honor, since this—*this is just collateral to show the relationship of the parties*—

THE COURT: *I know it is.*

MR. DENEND: That we—I ask Mr. Clemmer the question if there was any bad feelings between Mr. Blackwood and Mr. Richardson and just—and he answers that question yes or no if he knows or if he doesn't know, and then the next question would be was this continuous bad feeling over a period of time prior to the incident, and then the next question would be did this continue on through the night of the incident.

. . .

THE COURT: Seems to me that would save him from getting in trouble, and we could then proceed.

If you're going to do it that way, fine. Otherwise it causes all kinds of problems.

MR. DENEND: The only purpose of offering this, Your Honor, is to show the feelings that existed on the night in question between Mr. Blackwood and Mr. Richardson.

THE COURT: Rather than having him go into what happened, he can describe the feeling, and we'll not have those problems.

MR. DENEND: Okay.

THE COURT: Okay, bring the jury back in.

THE WITNESS: I'm sorry, Your Honor.

THE COURT: That's okay. I didn't know—we're trying to protect you.

THE WITNESS: I know, but I thought I had to answer.

THE COURT: No.

THE WITNESS: Okay.

. . .

By Mr. Denend:
Q. Mr. Clemmer, are you aware of the—the relative feelings that existed between Mr. Blackwood and Mr. Richardson prior to the night in question, the 15th of October?
A. Yes, I am.
Q. What was the feeling that existed between the two?
A. Well, Ray had super bad feelings towards Gary.
Q. And did this carry on into the night in question, the October 15—
A. Yes, it did.

(Italics mine.) Report of Proceedings, at 484–86.

As indicated by this exchange, witness Clemmer began to implicate himself in a separate crime when he began to explain the illegal skimming in which he and Blackwood were involved. The prosecutor interrupted, suggesting that Clemmer should be advised of his constitutional rights if he was going to admit to a crime. The judge then advised Clemmer of his rights against self–incrimination and advised him to consult an attorney. At that point, it became obvious that the defense counsel had been Clemmer's attorney on at least one previous occasion. The defense attorney then told Clemmer that he could not advise him in the present situation, and the trial court judge advised Clemmer he could talk to any other lawyer and come back later when he had done so. Defense counsel then stated that the testimony of skimming activities "is just collateral to show the relationship of the parties." Report of Proceedings, at 484. The defense counsel then suggested a compromise by having Clemmer testify only that there was a "continuous bad feeling over a period of time prior to the incident" between the defendant and Blackwood. The jury was brought back in, and Clemmer so testified. Report of Proceedings, at 484, 486.

The majority would now have us hold that this exchange and trial procedure indicates a lack of effective representation due to conflict of interest.

While there are no Washington cases specifically addressing the standards for evaluating assistance of coun-

sel at the appellate level, the United States Supreme Court has stated appellate counsel must "diligently investigate" possible grounds of appeal and act in the role of an "active advocate" on behalf of his client. *Anders v. California,* 386 U.S. 738, 18 L. Ed. 2d 493, 87 S. Ct. 1396, *reh'g denied,* 388 U.S. 924 (1967). *Accord, High v. Rhay,* 519 F.2d 109 (9th Cir. 1975).

On direct appeal, the test of ineffective assistance of trial counsel is whether, after considering the entire record, it can be said the accused was "'afforded an *effective representation* and a *fair* and *impartial* trial'". *State v. Renfro,* 96 Wn.2d 902, 909, 639 P.2d 737 (1982), quoting *State v. Thomas,* 71 Wn.2d 470, 471, 429 P.2d 231 (1967). Under this standard, a defendant is not guaranteed "successful" assistance of counsel, such as an acquittal. *State v. White,* 81 Wn.2d 223, 225, 500 P.2d 1242 (1972).

This test recognizes that the method and manner of preparing and presenting a case will vary with different counsel. If a defense counsel's trial conduct, which is later complained of, can be characterized as legitimate trial strategy or tactics, it cannot serve as the basis for a claim that a defendant received ineffective assistance of counsel. *State v. Adams,* 91 Wn.2d 86, 586 P.2d 1168 (1978); *State v. Hess,* 86 Wn.2d 51, 541 P.2d 1222 (1975); *State v. Ermert,* 94 Wn.2d 839, 621 P.2d 121 (1980).

Under the recent case of *In re Lile,* 100 Wn.2d 224, 225, 668 P.2d 581 (1983), we held that before we grant a personal restraint petition, the petitioner must prove that the constitutional errors worked to his actual and substantial prejudice.

Under differing circumstances, the United States Supreme Court recently addressed the burden of establishing ineffectiveness of trial court counsel on collateral review. In *Cuyler v. Sullivan,* 446 U.S. 335, 348–50, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980), the Court held that in order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected

his lawyer's performance. Once a defendant demonstrates that a conflict of interest actually affected the adequacy of his representation, he need not demonstrate prejudice in order to obtain relief. But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. This rule has been followed by the Washington courts of appeal. In *State v. Lingo*, 32 Wn. App. 638, 649 P.2d 130, *review denied*, 98 Wn.2d 1005 (1982), the court held that if codefendants do not raise at trial the issue of potential conflicts of interest arising from their representation by a single attorney, a claim on appeal that effective assistance of counsel was denied requires a showing of an actual conflict of interest between the codefendants which adversely affected their attorney's performance. *Accord, State v. Peyton*, 29 Wn. App. 701, 630 P.2d 1362, *review denied*, 96 Wn.2d 1024 (1981).

The rule of *Cuyler* arises out of multiple representation of codefendants who may have conflicts of interest or where defense counsel has represented a prosecution witness on related charges to that of the defendant.

The subject case differs significantly from those cases giving rise to the *Cuyler* rule. Clemmer was not a codefendant, but was a *witness* for the defense. The fact that an attorney once represented a client who subsequently becomes a witness in another trial does not automatically give rise to a conflict of interest, nor a Sixth Amendment violation. *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975), *cert. denied*, 423 U.S. 1066 (1976); *State v. Means*, 268 N.W.2d 802 (S.D. 1978); *State v. Thompson*, 55 Ohio App. 2d 17, 379 N.E.2d 245 (1977).

In *People v. Gorecki*, 54 Ill. App. 3d 267, 369 N.E.2d 380, 381 (1977), the court held defendant was not shown to have been denied effective assistance of counsel because the defense attorney did not call a potential witness due to past representation. The court reasoned that the testimony of defense counsel's witness was not used by the State to prove its case and no need existed to impeach that testi-

mony. Further, no showing was made that the versions of such witness and defendant differed, nor was there any indication that such testimony would be beneficial to the defense.

The record in the present case indicates Richardson's trial attorney did everything possible to bring in Clemmer's testimony concerning skimming activities at the tavern. The suggestion that Clemmer be advised of his constitutional right against self–incrimination came from the prosecutor, not defense counsel. The testimony which eventually was heard by the jury was a result of a compromise. The jury was informed of the hostile feelings Blackwood allegedly had toward the defendant. A review of the record as a whole indicates Clemmer's testimony concerning the skimming activities was not crucial, as Richardson was not charged with assaulting Blackwood, but a third party. At best, that part of Clemmer's testimony was incidental to the self–defense theory in that the defense counsel was merely attempting to establish "bad feelings" between Blackwood and Richardson, and such testimony was elicited.

The trial tactic of defense counsel was to establish a claim of self–defense based upon fear of mob action incited in part by Blackwood through ill feelings toward the defendant. The excluded testimony of skimming activities was only collateral to establishing Blackwood's animosity to defendant. The evidence of bad feelings between the parties was elicited, and hence negated any possible need to admit evidence of skimming activities.

The majority would have us remand the subject case to the trial court for a determination as to whether the relationship between the defense counsel and the defense witness posed a conflict of interest. Such a course of action is an unwarranted extension of the United States Supreme Court decisions concerning conflicts of interest. The rule of these decisions has never been applied in circumstances similar to those present in the subject case where a defense witness has been a prior client of defense counsel in an

unrelated matter. Defense counsel merely indicated that he could not advise the witness as to his rights against self–incrimination and, as a trial tactic, avoided the line of questioning which would pose a potential self–incrimination situation and obtained the desired testimony through other means.

The Supreme Court decisions that require an inquiry into a potential conflict of interest when the trial court "knows or reasonably should know" all concern multiple representation of codefendants in the same or related proceedings, or where a conflict exists between the defendant's employer who has employed defense counsel and the defendant.

If we are to follow the majority's line of reasoning, each time defense counsel had a prior relationship with any witness, the trial court would be required to make a special factfinding determination that no conflict of interest existed. In the small localities across the state, it is likely that defense counsel and prosecutor alike have had a relationship with many witnesses who might appear in a criminal proceeding. Under the majority ruling, separate hearings will be required in all these cases prior to the original criminal trial to determine any conflict of interest between attorneys and witnesses. If there are conflicts of interest, attorneys will have to be replaced, which might be difficult in a 4– or 5–attorney town.

Additionally, there are potentially hundreds of personal restraint petitioners in the future that will raise this same issue if we follow the suggested holding of the majority.

Whether measured under the rule of *Lile,* requiring an actual showing of prejudice, or *Cuyler,* requiring a showing of an actual conflict of interest adversely affecting defense counsel's performance, I am satisfied that petitioner had effective assistance of counsel and a fair and impartial trial. I cannot find that appellate counsel was ineffective in his failure to raise the issue of the incompetence of the defense attorney at trial.

I, therefore, would deny Richardson's personal restraint petition.

DIMMICK, J., concurs with DORE, J.