[No. 16472-8-II.   Division Two.   June 1, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. STEVEN W. GRAHAM, *Appellant*.

*Thomas Adkins Copland* and *Copland & Micheau* (appointed counsel for appeal), for appellant.

*Michael Smith, Prosecuting Attorney*, and *James Allen Conley, Special Deputy*, for respondent.

MORGAN, J. — Steven W. Graham appeals convictions

for delivery of marijuana (count 1) and possession of marijuana with intent to deliver (count 2). We affirm the conviction on count 1, but reverse the conviction on count 2.

On May 19, 1992, Pacific County Sheriff's Deputy Ronald Clark was told by two informants, Donna Gilkey and Jon Ward, that illegal drug activity was taking place at the residence of one David Anderson. According to Clark's later affidavit for a search warrant,

> 5. Reliable informant stated that at the Anderson residence he/she observed large amounts of marijuana located in a garbage bag which appeared to be about 1/3 full. While at the residence the reliable informant observed a drug transaction take place. Also in the house at that time was David Anderson, and his girlfriend known as "Candy", Michael who resides in the trailer east of the residence, and two unknown subjects. The two unknown subjects are said to be the suppliers/dealers of the marijuana at the residence at that time. These two unknown subjects are male; one said to be thin, wearing glasses, and the other, heavy-set. The heavy-set male told the thin male to go out to the truck and get the "weed", which he did. The thin subject then came back with the garbage bag of marijuana.

> The informant also said that these two male subjects were planning to leave tomorrow afternoon. The informant felt that there was a strong possibility that they may leave this evening if they sold out the marijuana. During the one transaction observed, both male subjects participated in the drug sale and the thin male had a large amount of bills.[1]

Clark and another officer then arranged a controlled buy in which they watched Gilkey and Ward enter and leave the Anderson house. They followed Gilkey and Ward to a predesignated location, where they received a bag of marijuana which, according to Gilkey and Ward, had been purchased at Anderson's. According to Clark's later affidavit for a search warrant,

> 8. The informant stated that the marijuana was taken from a freezer bag that contained bulk marijuana and then

---

[1]Motion to Supplement Record, Attachment 1, page 1-2.

weighed out on a hand scale. This was done by the thin male. The money was handed to the heavy-set man and the marijuana was handed to the informant by the thin male subject. The informant stated that he/she first entered the main house looking to purchase the marijuana and found out that the marijuana had been moved from the main house and was currently located in "Michael's" camper/trailer located on Anderson's property where the drug transaction took place. The informant stated that a blue duffel bag with brass zipper and white handles contained possible marijuana pre-weighed for distribution/sales. Also, other freezer bags containing suspected marijuana for the same purpose. The garbage bag is described to have a strip of masking tape on the bag.[2]

Based on the foregoing information, Clark "request[ed] a search warrant for (1) the residence located on the SE corner of 12th NE & Oregon Street in Long Beach, Washington, which is described as a mobile home, light brown in color with dark brown trim; (2) for the camper/trailer located on this property that 'Michael' is staying in, (3) the blue Chevy Luv pickup with camper, license number 12746G Washington".[3]

The warrant was issued by a commissioner of the Pacific County Superior Court, and executed about 1 a.m. on May 20. Officers found two pickup trucks, one belonging to a Michael Wade and one registered to Graham. The truck registered to Graham was a blue Chevy Luv pickup, with camper, parked next to the driveway about 20 feet from the house. Graham was inside the camper. A search of the camper disclosed a duffel bag containing a large bag of marijuana, multiple smaller bags of marijuana, a set of scales, and a pistol. Graham and three others were arrested.

Alleging that Graham was the thin male observed by the informants, the State charged him with count 1, delivery of marijuana, based on the controlled buy. It also charged him with count 2, possession of marijuana with

---

[2]Motion to Supplement Record, Attachment 1, page 2.

[3]Motion to Supplement Record, Attachment 1, page 3.

intent to deliver, based on the search of the blue Chevy Luv pickup.[4] Initially, it did not join Graham with any co-defendants.

Before trial, Graham filed a motion to suppress. He contended, among other things, that the affidavit supporting the warrant did not show probable cause to search his truck. The trial court denied the motion.

In August, Graham was tried jointly with Wade, Anderson, and a man named Martin. The record does not show how Graham came to be joined or consolidated with the other three. Nor does it show that Graham objected or raised the specter of a conflict of interest. Apparently, the State was claiming the other three were accomplices in the delivery of May 19, and also that Anderson and Martin were in possession of marijuana, less than 40 grams, on May 20.[5]

At trial, the four men were represented by the same appointed attorney. Donna Gilkey and Jon Ward, among others, testified for the State. None of the Defendants testified or presented evidence.

Three occurrences at trial are pertinent on appeal. First, Deputy Clark testified that he had been involved in 60 to 80 drug investigations. When asked, "[I]n your experience in drug investigations what are scales used for?", he answered, "They're to be used to weigh out portions of whatever they are distributing".[6] He also stated, "I think it's fairly common knowledge, and certainly has been my

---

[4]The information filed against Graham alleges that the delivery occurred "on or about" May 20, and that the possession with intent to deliver occurred "on or about" May 19. It appears that both sides have consistently treated count I as charging delivery on May 19, and count II as charging possession with intent on May 20.

[5]The record does not contain the informations against the other three. As set forth later, the prosecutor argued in closing that the other three had assisted in the delivery of May 19, and also that Anderson and Martin were in "simple possession" of marijuana when the police executed the search warrant on May 20. Also, the trial court instructed on possession with intent to deliver with respect to all three, and on possession of marijuana (less than 40 grams) with respect to Anderson and Martin.

[6]Report of Proceedings, at 53.

experience, that the narcotics trade is basically a cash trade and it is very common for people to carry currency".[7]

Second, Deputy Sheriff Scott Hamilton testified that he had attended the Washington State Patrol Academy for leaf marijuana identification training, where he had received 24 hours of training on identifying marijuana. He further testified that he had performed the "Duquenois-Levine" test on the green vegetable matter recovered in the search of Graham's truck, and that the vegetable matter tested positive for marijuana. When asked if the test was based on generally accepted scientific principles, he said, "I wouldn't know".[8]

Third, the prosecutor argued during closing argument that the Defendants were culpable in varying degrees. He said:

> Basically the Defendants are arranged in three categories: Mr. Wade, who is in my mind the least culpable of the three; there's Mr. Anderson and Mr. Martin who are in the second category; and then there's Mr. Graham who's in the last category.
>
> Now, Mr. Wade, all he's been charged with is Possession With Intent To Deliver on 5/19, one count. If you recall, he was present when the sale of drugs occurred early in the evening on the 19th. When the officers came in and searched they did not find anything in his possession. So all he's charged with is participating as an accomplice in the sale.
>
> . . ..
>
> Mr. Anderson and Mr. Martin are in the second category. They're both charged with the — as accomplices in the Possession With Intent To Deliver transaction that occurred on the 19th, then they're charged with the second simple Possession on the 20th. And the reason why they're both together is because we're arguing they're both accomplices, they both participated in the sale on the 19th early in the evening. And when the officers came back later that evening and searched, both of them were found to have drugs in their possession at that time.

---

[7]Report of Proceedings, at 73.

[8]Report of Proceedings, at 122.

Now, Mr. Graham is in the third category and he's a bit different because we're charging him with Delivery on the 19th. We're saying he was the one who actually delivered the drugs in the course of the sale. Then on the 20th we're charging him with Possession With Intent To Deliver, which is what these guys are charged with up here. The officers went back in and searched him and they found drugs on him, but we're arguing his situation is a bit different from — in fact significantly different from Mr. Martin and Mr. Anderson because when they came in and searched him they found a large quantity of drugs that had already been pre-packaged and ready for sale. So he sold drugs on the 19th and then when they came back in they found additional drugs that we're arguing shows he was continuing to sell and he would have sold those if he'd gotten a chance before the officers caught up with him. So that's why he's in a different category.[9]

Defense counsel's only response to this argument was to tell the jury, "Now remember, the State has only claimed that one individual actually made any delivery . . .. Only Mr. Graham is alleged to have made a delivery. They don't even claim otherwise other than that they were present, the other parties".[10]

On August 6, 1992, the jury found Graham guilty on both counts. On September 18, 1992, he was given a standard range sentence.

Graham now appeals. We dispose of count 2 in the first section of our discussion, and of count 1 in the remaining sections. We do not reach Graham's claim that a superior court commissioner cannot issue a search warrant; that claim is pertinent only to count 2, and we dispose of count 2 on other grounds.

I

■ Graham claims that the search warrant for his blue Chevy Luv pickup truck was invalid. An affidavit supporting a search warrant shows probable cause to search if a

---

[9]Report of Proceedings, at 129-31.

[10]Report of Proceedings, at 144-45.

reasonable person would understand from the facts contained therein that a crime has been or is being committed, and that evidence of the crime can be found at the place to be searched. *State v. Herzog*, 73 Wn. App. 34, 55, 867 P.2d 648, *review denied*, 124 Wn.2d 1022 (1994); *State v. Garcia*, 63 Wn. App. 868, 871, 824 P.2d 1220 (1992).

Here, the affidavit quotes the informant as saying that "the heavy-set male told the thin male to go out to the truck and get the 'weed', which he did". Other than that, it says nothing about a truck until the last, conclusory paragraph in which the affiant asserts that a search warrant should issue for a blue Chevy Luv pickup with camper. It does not show that the informant saw a pickup truck, or that the informant saw marijuana in a pickup truck. It does not show the location of any truck, or offer any means by which to distinguish one truck from another (for example, Graham's from Wade's). It provides no information about the ownership of any truck, and no information that would connect a particular "blue Chevy Luv pickup with camper, license number 12746G Washington" to either the heavy-set male or the thin male. In light of these deficiencies, a reasonable person reading the affidavit would not think that marijuana likely would be found in a "blue Chevy Luv pickup with camper", and the affidavit failed to show probable cause to search Graham's truck.

██ The State argues that even if the affidavit failed to show probable cause to search Graham's truck, the officers were nonetheless authorized to search it because the warrant showed probable cause to search the residence, and the blue Chevy Luv pickup truck was within the curtilage of the residence. In general, the curtilage is the area contiguous to a home in which the home's occupant has a reasonable expectation of privacy. *State v. Niedergang*, 43 Wn. App. 656, 661, 719 P.2d 576 (1986); 1 WAYNE R. LaFAVE, SEARCH & SEIZURE § 2.3(d), at 404 (2d ed. 1987). Thus, a vehicle is not within the curtilage when parked in a space that lawfully could be used by anyone coming to

the adjoining house on legitimate business—for instance, a police officer or salesperson. *Niedergang*, at 662.

The record in this case is devoid of evidence showing that Graham's truck was parked in an area in which Anderson had a reasonable expectation of privacy. Indeed, in a diagram attached as an appendix to the State's brief,[11] the State shows the truck parked next to, and slightly in, the public street (12th Street). It also shows that there was no fence or other barrier between Anderson's yard and the public street, the obvious conclusion being that the truck was parked in an area open to anyone who might come to the house on legitimate business. We conclude that the search of the truck was not authorized by the warrant for the house, and that the trial court erred by denying the motion to suppress.[12]

## II

■ Graham claims that the trial court erred by admitting the testimony about scales and money from Deputy Clark, and the testimony about marijuana identification from Deputy Hamilton. He concedes, however, that trial counsel failed to object to any of this testimony. Insofar as the claim is evidential rather than constitutional, it has not been preserved for review. *State v. Thetford*, 109 Wn.2d 392, 397, 745 P.2d 496 (1987).

---

[11]It appears the diagram was admitted at trial as exhibit 5. Report of Proceedings, at 30-31; see also Report of Proceedings, at 61-64. For some reason not apparent to us, neither side included it in the record on appeal.

[12]We do not overlook that the trial court included the following in its findings of fact:

8. At the suppression hearing Deputy Clark provided a diagram and various photos of the Anderson property which indicated that the Chevy Luv pickup was located within the curtilage of the Anderson property at the time the search was conducted.

This finding is not supported by substantial evidence, *see State v. Hill*, 123 Wn.2d 641, 671, 870 P.2d 313 (1994), or, indeed, by any evidence. It was entered nine months after the suppression hearing, seven months after the case was appealed, and one day before Graham filed his brief with this court. Nothing in the record shows that a copy was furnished to Graham's counsel before Graham filed his brief, and we cannot fault Graham for not assigning error in the way that the rules ordinarily require. *See* RAP 1.2(a); RAP 18.8(a).

### III

Graham makes four claims based on his Sixth Amendment right to counsel. We separately analyze each of the four.

### A

■ Graham claims "the trial court erred in allowing trial counsel to jointly represent four co-defendants".[13] The United States Supreme Court has expressly ruled, however, that the Sixth Amendment is not violated merely because one attorney represents more than one defendant. *Holloway v. Arkansas*, 435 U.S. 475, 482, 55 L. Ed. 2d 426, 98 S. Ct. 1173 (1978); *see also State v. Martinez*, 53 Wn. App. 709, 715, 770 P.2d 646, *review denied*, 112 Wn.2d 1026 (1989); *State v. James*, 48 Wn. App. 353, 365-66, 739 P.2d 1161 (1987).

### B

Graham claims that the trial court "reasonably should have known of a possible conflict when the public defender is representing four co-defendant[s] in a single trial".[14] Thus, he says, "the trial court should have inquired on the record as to any possible conflict of interest on behalf of trial counsel".[15]

■ Although the Sixth Amendment includes a right to representation free from conflicts of interest, *Wood v. Georgia*, 450 U.S. 261, 271, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981), *State v. Myers*, 86 Wn. 2d 419, 424, 545 P.2d 538 (1976), *State v. Hatfield*, 51 Wn. App. 408, 410, 754 P.2d 136 (1988), it does not require that a trial court "initiate inquiries into the propriety of multiple representation in every case". *Cuyler v. Sullivan*, 446 U.S. 335, 346, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980); *Martinez*, 53 Wn.

---

[13]Br. of Appellant, at 15.

[14]Br. of Appellant, at 16.

[15]Br. of Appellant, at 15.

App. at 715. Defense counsel has "an ethical obligation to avoid conflicting representations", and he or she should be trusted "to advise the court promptly when a conflict of interest arises". *Cuyler*, at 346. If defense counsel so advises, the trial court must inquire and take appropriate action. *Holloway v. Arkansas, supra; State v. Alexis*, 21 Wn. App. 161, 167, 584 P.2d 963 (1978). If defense counsel fails to so advise, the trial court still must inquire and take appropriate action where the case involves "special circumstances" as a result of which the trial court "knows or reasonably should know that a particular conflict exists". *Cuyler*, at 346-47; *Martinez*, at 715; *see Wood*, at 272 n.18. If defense counsel fails to advise and the case does not involve "special circumstances", the trial court need not inquire, for it "may assume either that multiple representation entails no conflict or that the lawyer and his clients knowingly accept such risk of conflict as may exist". *Cuyler*, at 347; *see also State v. Lingo*, 32 Wn. App. 638, 645, 649 P.2d 130, *review denied*, 98 Wn. 2d 1005 (1982).

Here, Graham concedes that defense counsel did not apprise the trial court of a conflict, and he fails to argue any "special circumstances" that should have caused the trial court to know of a particular conflict. On this claim, the only argument he makes is that a trial court must inquire whenever a single attorney represents two or more clients. This is not enough, and this claim fails.

## C

Graham argues that "the record reflects an actual conflict of interest"[16] that adversely affected his trial counsel's performance. The record suggests, he says, that this conflict kept counsel from objecting to Hamilton's testimony on marijuana identification and Clark's testimony on scales and cash; from submitting a trial brief and a set of proposed jury instructions; and from responding to

[16]Br. of Appellant, at 15.

the closing argument in which the prosecutor "ranked" the culpability of the four Defendants.[17]

Even when a trial court is not under a duty to inquire, a defendant demonstrates a Sixth Amendment violation if he or she shows "that an actual conflict of interest adversely affected his lawyer's performance". *Cuyler*, 446 U.S. at 348; *In re Richardson*, 100 Wn.2d 669, 677, 675 P.2d 209 (1983); *Lingo*, 32 Wn. App. at 645. To meet this burden, a defendant must point to specific instances in the record that suggest an actual conflict or impairment of his or her interest, and that suggest the lawyer's performance was adversely affected. *Martinez*, 53 Wn. App. at 715; *Hatfield*, 51 Wn. App. at 413; *James*, 48 Wn. App. at 366. A defendant is not required to demonstrate prejudice in the sense of showing that the conflict of interest affected the outcome of the trial. *Cuyler*, 446 U.S. at 349-50; *Richardson*, 100 Wn.2d at 677; *Martinez*, 53 Wn. App. at 713 (quoting *Richardson*); *Hatfield*, at 410; *see Holloway*, 435 U.S. at 487-91.

Turning to this case, the record does not suggest that a conflict of interest kept trial counsel from objecting to Hamilton's testimony on marijuana identification. Each of the four Defendants was on trial for some form of possession of marijuana, and each would have benefited from the exclusion of Hamilton's testimony. If the record suggests anything, it is that counsel did not object because he correctly thought the evidence was admissible.

The record does not suggest that a conflict kept trial counsel from objecting to Clark's testimony on scales and cash. Graham was the only one with the scales and substantial cash. An objection, if sustained, would have benefited him without harming the others. Moreover, counsel was not deterred from making a variety of objections on other matters, some of which related only to Graham. Again, if the record suggests anything, it is that counsel did not object because he correctly thought the evidence was admissible.

---

[17]Br. of Appellant, at 16-17.

The record does not suggest that a conflict kept trial counsel from submitting a trial brief or proposed jury instructions. More probable inferences are that such documents were not needed because counsel knew how the trial court had handled similar cases in the past, or that counsel generally does not prepare such documents in cases like the one at bar.

Finally, the record does not suggest that a conflict kept trial counsel from responding to the argument in which the prosecutor ranked the Defendants' culpability. A more probable inference is that such ranking needed no response because it was immaterial to anyone's guilt or innocence. For all these reasons, we conclude the record does not show an actual conflict of interest that adversely affected trial counsel's performance.

## D

■ Graham claims he did not receive effective assistance from trial counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must prove deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *In re Rice*, 118 Wn.2d 876, 888, 828 P.2d 1086 (1992), *cert. denied*, 113 U.S. 421 (1992). To prove deficient performance, a defendant must show that the representation fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, at 688; *Rice*, at 888. To prove resulting prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland*, at 694; *see also Rice*, at 889.

Here, Graham argues that counsel was deficient because he failed to move for severance or object to joinder, and because he failed to object to the evidence on marijuana identification, scales and cash. For reasons already explained, we do not think these failures amounted to deficient performance in a constitutional sense. Assuming

without holding they did, there was no prejudice, for the evidence against Graham was virtually airtight.

## E

Although we think that constitutional *minimums* were not offended, we also think that the procedures used here (or lack thereof) do not comport with good practice. The American Bar Association recommends:

> Except for preliminary matters such as initial hearings or applications for bail, defense counsel who are associated in practice should not undertake to defend more than one defendant in the same criminal case if the duty to one of the defendants may conflict with the duty to another. The potential for conflict of interest in representing multiple defendants is so grave that ordinarily defense counsel should decline to act for more than one of several codefendants except in unusual situations when, after careful investigation, it is clear either that no conflict is likely to develop at trial, sentencing, or at any other time in the proceeding or that common representation will be advantageous to each of the codefendants represented and, in either case, that:
>
> (i) the several defendants give an informed consent to such multiple representation; and
>
> (ii) the consent of the defendants is made a matter of judicial record. In determining the presence of consent by the defendants, the trial judge should make appropriate inquiries respecting actual or potential conflicts of interest of counsel and whether the defendants fully comprehend the difficulties that defense counsel sometimes encounters in defending multiple clients.

*ABA Standards for Criminal Justice: Defense Function*, § 4-3.5(c) (3d ed. 1992); *see also, Holloway*, 435 U.S. at 483 n.6, 486 n.8. This standard describes good practice, as opposed to constitutional minimums, and we urge that it be followed.

In conclusion, we affirm the conviction on count 1 but reverse the conviction on count 2 with directions to grant the motion to suppress. Assuming that count 2 is not reprosecuted to conviction, Graham is entitled to be resen-

tenced on count 1 using a standard range not affected by count 2.

BRIDGEWATER, J., and ALEXANDER, J. Pro Tem., concur.