# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINTON, | No. 81587-3-I |
| Respondent | |
| v. | DIVISION ONE |
| TRAMAINE CLAIBORNE, | UNPUBLISHED OPINION |
| Appellant. | |

ANDRUS, C.J. — Tramaine Claiborne, who pleaded guilty to second degree murder with a firearm enhancement, appeals an order denying his motion to withdraw the guilty plea.  Claiborne contends his attorney's conflict of interest deprived him of the right to effective assistance of counsel.  We reject this claim and affirm.

## FACTS

In August 2017, the State charged Tramaine Claiborne with murder in the second degree while armed with a firearm, based on the shooting death of Claiborne's childhood friend, Jamhal Keat.  According to the probable cause certification, witnesses observed a lengthy confrontation between Claiborne and

Keat at a Seattle gas station.[1]  Claiborne eventually drew a firearm and directed Keat to move his vehicle out of view of the gas station's security cameras. Claiborne then pointed the gun at Keat and, after Keat turned and attempted to run away, shot him.  Witnesses saw Keat fall to the ground, after which Claiborne continued to fire multiple times as he stood over his wounded friend.  Keat later died from numerous gunshot wounds to his chest and torso.  Witnesses saw Claiborne hide a 9 mm handgun in a nearby alleyway and then leave on foot. Police recovered eight spent 9 mm casings at the crime scene.  Claiborne, when detained, claimed he knew nothing about the shooting and was merely waiting nearby to pick up his daughter.  When police officers later formally interviewed him, Claiborne admitted to shooting Keat but claimed he was defending himself.

After the State charged Claiborne, he retained the law firm of John Henry Browne, P.S.  The retainer agreement identified Claiborne as the "client" and Zolanda Banks, Claiborne's mother, as the "Payor."  Both signed the agreement, but Banks explicitly acknowledged that she was not the client and was not entitled to override Claiborne's decisions or interfere with the professional judgment of the firm's attorneys.

The retainer agreement provided that, for a $30,000 fee, the firm would provide Claiborne with pretrial legal services including "[i]nvestigation, witness interviews, plea negotiations, and standard motion practice."  It further stipulated that "[t]he flat fee and any legal fees described in this contract will not be returned or refunded to the Client because the Client is disappointed with the result."  It also

---

[1] In the felony plea agreement, Claiborne stipulated that the facts set out in the probable cause certification were "real and material facts."

2

made it clear that if the case proceeded to trial, the parties "will agree on additional legal fees and possible costs to be paid by the Client and Payor in a separate agreement."

Although the retainer agreement identified Browne and Emma Scanlan as the law firm's attorneys, it also authorized the firm to employ any associate counsel to assist on the case. Scanlan was "of counsel" to Browne's firm and it paid her an hourly rate for her work on firm cases. Scanlan, an experienced criminal defense attorney, maintained a separate caseload of her own cases unconnected to the firm.

Scanlan took the lead on Claiborne's case, working with an investigator to review discovery, interview witnesses, visit the scene, consult with experts, and visit face-to-face with Claiborne in the jail. The defense theory was that Claiborne shot Keat in self-defense. But based on their pretrial work, both Scanlan and Browne came to believe that self-defense was not a strong defense and pursuing a plea deal would best serve Claiborne's interests.

In March 2019, the State offered to allow Claiborne to plead guilty to second-degree murder with a reduced deadly weapon enhancement. The State indicated that if Claiborne did not plead guilty to this charge, it intended to add a count of murder in the first degree. Claiborne initially agreed to accept the offer, but changed his mind before a plea hearing and decided to proceed to trial. Shortly thereafter, the court allowed the State to amend the charging document to add one count of first-degree murder, also with a firearm enhancement.

On April 10, 2019, Claiborne's family members, upset with the recommendation that Claiborne accept the State's plea offer, met with Browne and Scanlan. They expressed the opinion that Browne was insufficiently involved or invested in Claiborne's case. After addressing these complaints and additional concerns the family raised about their ability and willingness to expend additional funds for trial, Scanlan believed the meeting ended amicably.

The next day, however, Browne learned that Banks had, a week earlier, filed two complaints against him with the Washington State Bar Association ("the WSBA"). The complaints were both typed, filed online within minutes of each other, and identically-worded. One grievance was filed in Banks's name and the other, in Claiborne's name. Both complaints asserted that Browne was "ineffective" because he negotiated a plea offer that would have resulted in a sentence of up to 20 years in a "self defense case with no priors." The complaints also stated that Browne should be required to provide a "refund for a new attorney that is willing to fight." Neither complaint mentioned Scanlan. The WSBA dismissed both complaints before it sent copies to Browne.

Browne communicated with Banks by email, expressing his disappointment that she had not mentioned the WSBA complaints when they met in person. Browne wrote: "This is very unfortunate as it creates a conflict of interest at the least." Browne told Banks that he and Claiborne would decide together whether the attorney-client relationship could continue and that any further representation would be contingent on the family's agreement to pay additional fees for trial. Banks reiterated her belief that Browne was not sufficiently committed to

Claiborne's case and she "expected more fight" for the $30,000 fee. Banks expressed satisfaction with Scanlan's representation, noting that Scanlan had met with Claiborne several times and "tried very hard."

Browne then moved to withdraw from the case because of a "breakdown" in his communication with Claiborne and Claiborne's family and because his relationship with them had "soured" to the point that he felt he could no longer represent Claiborne.[2] The day before the hearing on Browne's motion, he called the prosecutor to inform him of the basis for his motion. Browne said he was having a "difficult" time working with Claiborne, "or more specifically," Claiborne's family, and that the family had not yet paid Browne to represent Claiborne at trial.

At the April 24, 2019 hearing, Browne informed the court that communications with Claiborne and his family had "broken down." According to Browne, the relationship was also strained, in part, because of the bar complaints filed against him. Browne stated that although he had diligently negotiated with them, Claiborne's family refused to pay the additional fees required for the firm to represent Claiborne at trial, then scheduled to begin in a month, despite there being 20 witnesses yet to be interviewed.

Claiborne adamantly denied filing a grievance against Browne. The court asked whether his family had filed a grievance on his behalf, and he denied it. He asserted he did not have the capability to file an online grievance, given that he was in custody. Claiborne indicated that if Browne withdrew, he wanted the court to appoint counsel. The court stated that because the financial issue could be

---

[2] CrR 3.1(e) provides that once a criminal case is set for trial, an attorney is not permitted to withdraw "except upon written consent of the court, for good and sufficient reason shown."

addressed to some extent through the Department of Public Defense (DPD), the court deemed the communication and relationship problems to be the more "pressing" concerns. The court continued the matter and asked Browne to file copies of the bar complaints.

As instructed, Browne filed the documents under seal with an accompanying motion to withdraw. In his motion, Browne reiterated that communications with Claiborne had "broken down completely." He stated the family was dissatisfied with the plea bargain he and Scanlan negotiated and disagreed with his opinion that self-defense was not a viable defense. Browne further indicated he and Scanlan had devoted more than 125 hours to the case, had interviewed 10 of the 30 potential witnesses, and, despite the ongoing fee negotiations, they continued to prepare for trial. Browne stated Scanlan was amenable to taking over the case as appointed counsel, but he was not.

Scanlan spoke with Claiborne twice after the April 24 hearing and, on both occasions, he said he wanted her to continue to represent him, even if Browne withdrew. Scanlan also conferred with Claiborne's family, who agreed to support her appointment. Based on these conversations, Scanlan contacted DPD and confirmed it would not oppose her court appointment.

At a May 2, 2019, hearing, Browne informed the court that his relationship with Claiborne had deteriorated further. Claiborne expressly stated he wanted Scanlan to remain on the case because he had been "building this whole case with her this whole time." The trial court granted Browne's motion to withdraw and appointed Scanlan to represent Claiborne. The court also continued Claiborne's

trial from May 22 to August 12, 2019, to accommodate the prosecutor's pre-planned travel.

Browne had no further involvement in the case after May 2 and DPD compensated Scanlan after that date. In June 2019, Scanlan obtained authorization to have attorney Lisa Mulligan, another experienced criminal defense attorney, appointed to serve as co-counsel for Claiborne's trial.

Several weeks before trial, in July 2019, Claiborne again expressed interest in resolving the case by a plea. Scanlan agreed to contact the prosecutor, but expressed doubt that the State would offer the same terms Claiborne had previously rejected. The prosecutor did agree to allow Claiborne to plead guilty to second-degree murder, but insisted he do so with a firearm enhancement, instead of the previously offered deadly weapon enhancement. The State agreed to recommend a sentence of 20.5 years (246 months) and to allow Claiborne to request a sentence within the standard range. Claiborne decided to accept the offer. Scanlan and Mulligan met with Claiborne a few days before the scheduled plea hearing and reviewed the plea paperwork with him.

But Claiborne once again decided against changing his plea because he believed, erroneously, that the State's sentence recommendation in the paperwork was different than what the State had offered and he had accepted.

The trial court began hearings on pretrial motions on August 12, 2019. The next day, counsel gave Claiborne a message from his father, encouraging him to consider a plea. This message led Claiborne to ask his attorneys about a possible plea and their assessment of the State's case. Both Scanlan and Mulligan told

him that if he went to trial, the best outcome he could hope for was a conviction of second-degree murder with a firearm enhancement. They spent a significant amount of time discussing the likelihood that the State could obtain a conviction for first-degree murder. Scanlan and Mulligan planned to argue that Claiborne lacked premeditation based on the anticipated testimony of one witness who said Claiborne fired the shots quickly, one after the other, without pause. But both attorneys believed there was sufficient evidence to support a finding of premeditation, based on other eyewitness testimony, including a witness who said that she observed Claiborne lure Keat to a secluded area and warned Keat that Claiborne was going to shoot him.

During a trial recess, Claiborne told Scanlan and Mulligan he wanted to plead guilty. When they relayed the request to the prosecutor, the State offered Claiborne the same terms he had rejected just before trial. Scanlan and Mulligan again reviewed the plea paperwork with Claiborne. On August 14, 2019, after a full colloquy, the court accepted Claiborne's plea to second degree murder with a firearm enhancement, finding that his plea was knowing, intelligent, and voluntary.

Claiborne faced a standard range sentence of 183 to 280 months. The State recommended 246 months, in accordance with the plea agreement. The court, after considering Claiborne's mitigation report and the impassioned statements of numerous individuals associated with the defendant and the victim, sentenced Claiborne to 252 months, 6 months above the State's recommendation, and almost 6 years above the defense's recommendation, but below the high end of the standard range. When it imposed this sentence, the court observed that,

according to its review of the evidence, the shooting was not in self-defense, given that the victim was unarmed and running away when Claiborne initially shot him, and described the shooting as an "execution."

Approximately a month after he was sentenced, Claiborne hired new counsel and moved to withdraw his plea. Among other things, Claiborne alleged that because of the bar complaint filed in his name, Browne had a conflict of interest that should have been imputed to Scanlan, and he was given no choice but to accept Scanlan's appointment. Claiborne also maintained that Scanlan and Mulligan failed to substantially assist him during the plea process because they pressured him to plead guilty, said they were 100 percent certain he would be convicted at trial, and led him to believe that the witness whose testimony would support a defense to first-degree murder would not testify at trial. The State, in response to the motion, submitted approximately 300 pages of exhibits, including the declarations of Scanlan, Browne, Mulligan, and the prosecutor involved in plea negotiations.

The court conducted an evidentiary hearing with testimony from Claiborne, Scanlan, and Mulligan. At the conclusion of the hearing, the trial court denied the motion, finding no conflict of interest between Claiborne and Browne and no basis to allow Claiborne to withdraw his plea. The court found that neither Browne nor Scanlan violated any Rules of Professional Conduct ("RPCs"), and Claiborne had provided no authority to support the position that the bar complaint, resulting from his family's dissatisfaction with the amount of the retainer and the legal services Browne provided, created a conflict of interest between Claiborne and Browne.

And although Claiborne now testified that he had, in fact, filed the bar complaint against Browne "with outside help," the court expressly found this testimony not "credible." Instead, the court found that Claiborne was "honest" when he stated in April 2019 that he had had nothing to do with the bar complaints—statements he made before he realized that it would serve his interest in setting aside the plea if he testified differently.

The court also found Scanlan and Mulligan had not provided deficient legal representation.[3] The court determined that Claiborne pleaded guilty because there was "overwhelming" evidence of his guilt. Specifically, the court found that it was "hard to imagine a much easier case for the State to prove," given that Keat "was shot six times, and several of those shots were in the back," and then was shot in front of the chest while lying down as Claiborne stood over him. Finally, the court recalled that, in view of the fact that Claiborne was facing a significant sentence and had already twice changed his mind about pleading guilty, the court had engaged in a detailed colloquy with Claiborne at the time of the plea. The court found there was nothing in the record to indicate that Claiborne had not knowingly, intelligently, and voluntarily entered his plea.[4] Claiborne appeals.

## ANALYSIS

Claiborne challenges the trial court's determination that Browne had no conflict of interest. Claiborne contends that, in resolving his motion to withdraw, the trial court was bound by a May 2019 determination that Browne did, in fact,

---

[3] Claiborne does not challenge this aspect of the trial court's ruling on appeal.

[4] The court's written order denying the motion indicates that formal findings of fact and conclusions of law will be entered at a later date, but it does not appear any findings and conclusions were ever actually entered.

have a conflict of interest. Specifically, Claiborne maintains that his interests were adverse to Browne's because (1) he submitted a bar complaint against Browne, and (2) as of May 2019, his family had not yet paid Browne's firm for trial representation.

We generally review a trial court's ruling on a motion to withdraw a plea for abuse of discretion, especially where the ruling requires resolution of facts. *State v. Buckman*, 190 Wn.2d 51, 57, 409 P.3d 193 (2019). But when the request to withdraw is based on a claimed constitutional error that is subject to de novo review, our review is de novo. *Id*.; *see State v. O'Neil*, 198 Wn. App. 537, 542, 393 P.3d 1238 (2017) (existence of conflict of interest is a question of law reviewed de novo).

<u>Motion to Withdraw Plea Based on Conflict of Interest</u>

A motion to withdraw a guilty plea after entry of the judgment and sentence is a collateral attack subject to CrR 7.8; it is not enough to demonstrate a manifest injustice under CrR 4.2. *See* CrR 4.2(f) (court shall allow withdrawal of plea where "necessary to correct a manifest injustice"); *State v. Lamb*, 175 Wn.2d 121, 128, 285 P.3d 27 (2012). Under CrR 7.8, the court may relieve a party from final judgment for reasons including mistake, newly discovered evidence, and fraud.[5]

---

[5] CrR 7.8(b) provides, "[o]n motion and upon such terms as are just, the court may relieve a party from a final judgment, order, or proceeding for the following reasons:

(1) Mistakes, inadvertence, surprise, excusable neglect or irregularity in obtaining a judgment or order;
(2) Newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under rule 7.5;
(3) Fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party;
(4) The judgment is void; or
(5) Any other reason justifying relief from the operation of the judgment.

*In re Pers. Restraint of Stockwell*, 179 Wn.2d 588, 595, 316 P.3d 1007 (2014). Claiborne does not allege a specific ground under CrR 7.8(1) through (4), and relief under the "catchall" provision of CrR 7.8(b)(5) for "[a]ny other reason justifying relief from the operation of the judgment," is available only "where the interests of justice most urgently require." *Lamb*, 175 Wn.2d at 128.

A collateral attack under CrR 7.8 also generally requires a showing of actual and substantial prejudice even when asserting "constitutional errors that might be presumed prejudicial on direct review." *Buckman*, 190 Wn.2d at 64. But when an actual conflict impaired the attorney's performance resulting in the deprivation of counsel, the error may be reversible even without a showing of actual prejudice. *In re Pers. Restraint Petition of Richardson*, 100 Wn.2d 669, 677, 675 P.2d 209 (1983).

The Sixth Amendment to the United States Constitution guarantees the right to effective assistance of counsel. U.S. CONST. amend. VI; see *In re Pers. Restraint of Gomez*, 180 Wn.2d 337, 350, 325 P.3d 142 (2014). The guarantee comprises two correlative rights: the right to counsel of reasonable competence, *McMann v. Richardson*, 397 U.S. 759, 771, 90 S. Ct. 1441, 25 L. Ed. 2d 763 (1970), and the right to counsel's undivided loyalty, *Wood v. Georgia*, 450 U.S. 261, 272, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981). *See State v. Dhaliwal*, 150 Wn.2d 559, 566, 79 P.3d 432 (2003) (right to assistance of counsel includes the right to conflict-free counsel). A conflict of interest is not a "per se violation" of the right to the effective assistance of counsel. *Gomez*, 180 Wn.2d at 348. A defendant must show both that (1) counsel actively represented conflicting

interests and (2) the conflict adversely affected counsel's performance. *Id*. at 348-49 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980)). The defendant bears the burden of proof as to both an actual conflict and adverse effect. *Dhaliwal*, 150 Wn.2d at 573.

A. Actual Conflict

Under the first prong of this analysis there must be an "actual conflict," which is one that affects " 'counsel's performance—as opposed to a mere theoretical division of loyalties.' " *Dhaliwal*, 150 Wn.2d at 570 (quoting *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002)); *see also United States v. Baker*, 256 F.3d 855, 860 (9th Cir. 2001) (actual conflict of interest exists when the attorney's and defendant's interests diverge with respect to a material factual or legal issue or a strategy).

Consistent with the right to the undivided loyalty of counsel, the RPCs prohibit a lawyer from representing a client if there is a "concurrent conflict of interest." RPC 1.7(a). Such a conflict exists if there is a "significant risk" that the representation of a client will be "materially limited" by a lawyer's "personal interest." RPC 1.7(a)(2). A lawyer's own interest, in the context of RPC 1.7, refers to a "financial or familial interest or an interest arising from the lawyer's exposure to culpability." *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 740, 16 P.3d 1 (2001). While the RPCs "do not 'embody the constitutional standard for effective assistance of counsel,' " they do serve as guidelines "for determining what is reasonable." *Gomez*, 180 Wn.2d. at 349 (quoting *State v. White*, 80 Wn. App. 406, 412-13, 907 P.2d 310 (1995)).

Contrary to Claiborne's assertion, when the trial court permitted Browne to withdraw in May 2019, it did not do so because of an actual conflict of interest in violation of RCP 1.7. The court made no finding that a conflict of interest existed and it does not follow that, by granting the motion, the court necessarily found a violation of RPC 1.7 or such a conflict. The primary basis for Browne's motion to withdraw was his strained relationship and communications with Claiborne due to underlying disagreements with Claiborne's family over strategy, Browne's level of personal involvement, and failure to reach agreement as to additional fees for trial representation. While Browne informally mentioned a "conflict of interest" to Banks after he learned of the bar complaints, no party argued to the trial court that withdrawal was appropriate because of a conflict of interest under RPC 1.7. Claiborne himself admitted that the problems involved "miscommunication" with his family about the "trial fee separate from the retainer."

The bar complaint did not create an actual conflict under RPC 1.7. First, the trial court found Claiborne had not actually filed such a complaint and discredited his inconsistent testimony in support of the motion to withdraw. Second, even if Claiborne had filed the complaint, it would not create a conflict of interest as contemplated under the RPCs. Several courts, including those in Washington, have held that bar complaints, lawsuits, and claims of ineffective assistance create only potential, rather than actual, conflicts of interest. *State v. Sinclair*, 46 Wn. App. 433, 437, 730 P.2d 742 (1986) (bar complaint); *United States v. Moore*, 159 F.3d 1154, 1158 (9th Cir. 1998) (threat of lawsuit); *State v. Rosborough*, 62 Wn. App. 341, 346, 814 P.2d 679 (1991) (ineffective assistance).

*Sinclair* is dispositive of Claiborne's argument. In that case, the defendant argued that his formal disciplinary complaint against appointed counsel created a conflict of interest. *Sinclair*, 46 Wn. App. at 437. We rejected the argument, reasoning that a defendant should not be permitted to "force the appointment of a new attorney simply by filing such a complaint, regardless of its merit." *Id.* at 437. Whether Banks filed bar complaints with or without Claiborne's knowledge and consent, they did not create an actual conflict of interest.

Third, the WSBA summarily dismissed the complaints without Browne having to respond. He did not need to take any action to "preserv[e] his reputation" or to "avoid[] any criticism of his performance," as Claiborne argues on appeal. Browne was not even aware of the complaints until after the bar had dismissed them. There is no allegation—or anything in the record to suggest—that the complaints diverted Browne's attention away from the case or caused him to take any defensive position that was adverse to Claiborne's interests in the criminal case.

As to the failed negotiations for a new retainer agreement and payment of additional fees, Claiborne does not explain why the failure to reach a new agreement with Browne was an actual conflict of interest within the meaning of RPC 1.7. The scope of the contract between the firm and Claiborne unambiguously encompassed only pretrial legal services and required a new agreement for trial representation. The need to negotiate a new contract for fees if Claiborne wished to proceed to trial was not a "conflict."[6]

---

[6] Claiborne conceded at oral argument that the agreement limiting the scope of the representation was neither unethical nor a violation of the RPCs. June 7, 2022 Court of Appeals,

Claiborne implies that a conflict arose from the fact that, when Browne withdrew, the firm was not compensated for legal services performed on his behalf. But nothing in the record contradicts Browne's statement that while negotiating a new fee contract with the family, Browne and Scanlan continued to prepare for trial. While Claiborne points out that a substantial number of witness interviews were outstanding when Browne withdrew, Claiborne and Scanlan knew that trial would not begin for several months.

Claiborne cites no authority that supports his position that a disagreement over fees for additional legal services creates a conflict of interest. He relies on *United States v. Hearst*, 638 F.2d 1190, 1193 (9th Cir. 1980), in which Patty Hearst's defense counsel entered into a contract to author a book about her trial and allegedly took specific strategic actions to maximize publicity and interest in the case solely to further his own financial interests at the expense of obtaining an acquittal for Hearst. The facts here do not remotely resemble those in *Hearst*.[7] There is nothing in the record to indicate that Browne took any action in the criminal case to further his own financial interests that compromised Claiborne's defense. *See In re Marriage of Wixom*, 182 Wn. App. 881, 899, 332 P.3d 1063 (2014) ("If attorney and client disagree about who is at fault and point their fingers at each

---

Division I, Argument at 2:08 – 2:30, available at https://www.tvw.org/watch/?clientID=9375922947&eventID=2022061053.

[7] The United States Supreme Court later called the *Hearst* decision into question. *See Mickens*, 535 U.S. at 174-75.

other in response to a request for sanctions, the interests of the two are clearly adverse").[8]

We conclude the bar complaints and Claiborne's family's dispute with Browne over his fees for additional legal representation did not create adverse interests related to any material factual or legal issue or trial strategy in Claiborne's case. No actual conflict of interest existed.

B. Deficiency in Performance

Nor has Claiborne established that the conflict with Browne adversely affected his trial counsel's performance. To do so, he must show that a plausible alternative defense strategy was available, but was not pursued, because of the conflict with the attorney's other interests. *State v. Regan*, 143 Wn. App. 419, 428, 177 P.3d 783 (2008) (conflict involving defense counsel's testimony adverse to client's interests). A conflict adversely affects an attorney's performance when it causes "some lapse in representation contrary to the defendant's interests or likely affected particular aspects of counsel's advocacy." *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019) (second alteration in original) (internal quotation marks omitted) (quoting *Regan*, 143 Wn. at 428). Claiborne must identify "specific instances in the record." *State v. Graham*, 78 Wn. App. 44, 55, 896 P.2d 704 (1995).

According to Claiborne, the alleged conflict adversely affected Browne's advocacy because he (1) assigned most of the work to Scanlan in order to "maximize" profit; (2) had not completed interviews of necessary witnesses by April 2019; (3)

---

[8] *Mannhalt v. Reed*, 847 F.2d 576, 582 (9th Cir. 1988), another case on which Claiborne relies, involved an actual conflict of interest because the defense attorney was accused of crimes similar or related to his client. No such facts exist here.

failed to inform Claiborne that he could oppose Scanlan's appointment; and (4) failed to return any unused funds from the retainer fee so Claiborne could retain new counsel. Each of these allegations is either unsupported by the record or does not establish a lapse in the representation that adversely affected Claiborne's case.

First, Scanlan, an experienced criminal defense attorney, had primary responsibility for investigating the case long before the alleged conflicts arose. Claiborne identifies no deficient performance on her part in preparing for trial and does not explain how her lead role was detrimental to his case. He does not allege that his attorneys failed to interview all necessary witnesses or were otherwise unprepared when trial actually began in August 2019. Nothing in the record suggests Claiborne or Banks were entitled to a refund. The agreement itself states that "[t]he Client may or may not be entitled to a refund if Attorney's representation is terminated before the agreed legal work is completed." In short, Claiborne identifies no plausible defense strategy or tactic that defense counsel failed to pursue because of the alleged conflict.

During his evidentiary hearing, Claiborne testified that when Browne withdrew in 2019, he believed Scanlan could not represent him due to a conflict of interest. He also stated he had no choice but to accept Scanlan's appointment because the court indicated that the case had "gone on for long enough." But the trial court expressly found this testimony to be not credible because it directly contradicted statements Claiborne made at the time Browne sought to withdraw. The record supports the trial court's determination that Claiborne wanted Scanlan to

represent him and did not accept Scanlan's appointment simply because he believed he had no choice.

Finally, Claiborne alleges that, when Browne told the prosecutor he intended to withdraw, he improperly informed the State he was not being paid and was not "invested" in defending Claiborne. Claiborne asserts that these statements constitute the disclosure of "confidential" information in violation of RPC 1.6 (duty to refrain from revealing information relating to the representation of a client without informed consent unless impliedly authorized to carry out the representation or unless certain exceptions apply). We reject this argument. Claiborne did not identify the improper disclosure of client confidences or a violation of RPC 1.6 as a basis to withdraw his plea, and we generally do not address issues raised for the first time on appeal. *See* RAP 2.5(a) (this court "may refuse to review any claim of error which was not raised in the trial court"). Although a party may raise a "manifest error affecting a constitutional right," for the first time on appeal, such an error is "manifest" only if the appellant shows actual prejudice, or in other words, "practical and identifiable consequences." RAP 2.5(a)(3); *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009). Here, Claiborne does not assert any actual prejudice; he simply claims, without further elaboration, that Browne disclosed information that "could be used to the State's advantage." We decline to further consider this claim of error.

The trial court permitted Claiborne's attorney to withdraw based on deterioration of the attorney-client relationship and resulting breakdown in communication, not because of any actual conflict of interest. Browne had no actual conflict of interest that adversely affected his representation within the

meaning of RCP 1.7 and there is no basis to impute a conflict to Scanlan, who represented Claiborne when he pleaded guilty months later.[9]  The trial court did not err in denying Claiborne's motion to withdraw his plea.

Affirmed.

WE CONCUR:

Andrus, C.J.

_____

_____                    _____

---

[9] Because there was no imputed conflict, there was no need for Claiborne to waive his right to conflict-free counsel before the court appointed Scanlan.